IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| SIMON BALDERAS, ET AL. | § | |
| | § | CIVIL ACTION |
| vs. | § | NO. 6:01CV158 |
| | § | |
| STATE OF TEXAS, ET AL. | § | |

This Filing Applies to: All Actions

Before HIGGINBOTHAM, Circuit Judge, HANNAH and WARD, District Judges.

PER CURIAM:

This phase of the redistricting case involves the Texas congressional districts following the 2000 census. After a period of deferral to the State of Texas as mandated in *Growe v. Emison*[1] and the failure of the State to produce a congressional redistricting plan, we are left with the "unwelcome obligation of performing in the legislature's stead."[2] We will describe the course of this litigation and explain the process by which we drew the congressional redistricting plan which we order.[3]

I

---

[1] 507 U.S. 25 (1993).

[2] *Connor v. Finch*, 431 U.S. 407, 415 (1977).

[3] The Congressional Districts imposed by this court's Final Judgment shall bear the number 1151C, which is the next number available for public plans within the Texas Legislative Council's RedAppl 2001 computer program.

Voters and various officeholders filed multiple lawsuits in state and federal court challenging the districting of Texas' congressional seats and both houses of the state legislature based on the 2000 census.[4] The federal cases were consolidated into the earliest-filed federal action, *Balderas v. Texas*, No. 6:01-CV-158, before this three-judge court.[5] Pursuant to the Supreme Court's direction in *Growe*, on July 23, 2001 we deferred proceedings in federal court until October 1, 2001. We directed that the trial of any challenge to any state-adopted plan for congressional districts, or of any dispute over an appropriate plan to be adopted if the State adopted no plan, would begin on October 15, 2001. Any trials of the disputes over the districts for the state Senate and House would follow in that order. The record in each trial would rest on the trials which preceded it as well as its own. We prescribed the usual pre-trial tasks. All this was to reduce, if not avoid, any delay in the electoral process and to follow the specific command of the Supreme Court in *Growe*.

On September 12, 2001, the Texas Supreme Court determined that the Travis County trial court had dominant jurisdiction among the

---

[4] *Balderas v. Texas*, Civil No. 6:01-CV-158 (E.D. Tex.); *Mayfield v. Texas*, Civil No. 6:01-CV-218 (E.D. Tex.); *Manley v. Texas*, Civil No. 6:01-CV-231 (E.D. Tex.); *Del Rio v. Perry,* No. GN-003665 (353rd Dist. Ct., Travis County, Tex.); *Cotera v. Perry,* No. GN-101660 (353rd Dist. Ct., Travis County, Tex.); *Connolly v. Perry,* No. GN-102250 (98th Dist. Ct., Travis County, Tex.); *Associated Republicans of Texas v. Cuellar,* No.2001-26894 (281st Dist. Ct., Harris County, Tex.); *Rivas v. Cuellar,* No.2001-33760 (152nd Dist. Ct., Harris County, Tex.).

[5] Other three-judge courts had dismissed prior suits filed prematurely.

state cases to hear the various plaintiffs' redistricting claims and held that a state trial court in Travis County must decide the districting dispute. The Travis County court commenced trial on September 17, 2001. It heard testimony and arguments from all the parties, concluding trial on September 28, 2001.

On October 1, 2001, at the request of the state trial judge, we extended the deadline for the filing of any congressional redistricting plan to October 3, 2001. On October 3, the state trial court issued a plan, known as 1065C. No provision was made in our October 1 order for the filing of any new plan, although the state trial judge advised that he might modify the plan on or before October 10, 2001. The schedule we had provided did not contemplate major changes in the state court plan filed on October 3. On October 10, 2001, the state court nonetheless issued a new plan, known as 1089C. We immediately delayed the start of any federal trial for one week to October 22 at the request of the parties who pointed to the need for additional time given the substantial differences between the two plans of the state court. On October 19, 2001, however, the Texas Supreme Court vacated the trial court's October 10, 2001 judgment based on a violation of the parties' state constitutional rights and remanded the case to the state trial court.[6] The Texas Supreme Court also concluded that

---

[6] *Perry v. Del Rio*, No. 01-0988, 2001 WL 1285081, at *9 (Tex. Oct. 19, 2001).

1065C, the first plan of the state trial court, was not the baseline plan for this court to use, because 1065C was never adopted as a final judgment by the state trial court. The Texas Supreme Court acknowledged that the end result of the state processes left the federal courts with no choice but to proceed without the benefit of a state plan.[7]

As forecasted by the Texas Supreme Court, we proceeded to trial in Austin, Texas on October 22, 2001, without a state baseline plan in place. This court heard testimony and took evidence on congressional redistricting plans between October 22 and November 1, concluding with final argument on November 2. The parties filed post-trial briefs on November 7, 2001. After reviewing the evidence and the parties' submissions, we now turn to our decision implementing a plan for the redistricting of the Texas congressional districts based on the 2000 census.

II

Federal courts have a limited role in crafting a congressional redistricting plan where the State has failed to implement a plan. The limits are not to be found in the traces of the unconstitutional plan being replaced. "Although a court must defer to legislative judgments on reapportionment as much as possible, it is forbidden to do so when the legislative plan would not meet the special standards of population equality and racial fairness that

---

[7] *Id.*

are applicable to court-ordered plans."[8]  Rather, the court must draw a redistricting plan according to "neutral districting factors," including, *inter alia*, compactness, contiguity, and respecting county and municipal boundaries.[9]  The 1991 plan as modified in 1996 is conceded by all parties to be unconstitutional, made so by changes in population disclosed by the decennial census, if not also for other reasons.  In our effort to steer the required neutral course through this political sea, we have been assisted by the many distinguished political scientists who have testified in this case.

Dr. John Alford, Rice University professor of political science, detailed in his trial testimony a process drawing upon principles of district line-drawing that stand politically neutral.  We found that process, substantially parallel to our preliminary thinking and that of other courts, to be the most appropriate for our judicial task.

Our decisional process accepted the reality that, as with so many decisional processes, the sequence of decisions is critical.  Starting with a blank map of Texas, we first drew in the existing Voting-Rights-Act-protected majority-minority districts.  We were persuaded that the next step had to be to locate Districts 31 and 32, the two new Congressional seats allotted to Texas following the

---

[8] *Upham v. Seamon*, 456 U.S. 37, 39 (1982) (per curiam).

[9] See *Abrams v. Johnson*, 521 U.S. 74, 88, 98 (1997); *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

2000 census. As observed by Dr. Alford, the most natural and neutral locator is to place them where the population growth that produced the new additional districts has occurred.[10] It is self-evident that this locator is, across cases, neutral down to the immediate area, if not in the ultimate, precise fit on the ground. Here the new districts' precise landing was virtually dictated by step 1. When we sent the two new districts to the areas of greatest population growth, Dallas County and Harris County, the districts necessarily landed in the northern half of these counties, and, in the case of District 31, continuing over to Williamson County. Their landing was directed by the location of the protected majority-minority districts in southern Dallas and Harris Counties, which could not be disrupted. Use of this neutral guide was further supported by the circumstance that the Texas legislature has previously located new districts in the areas of greatest population growth.[11]

With a large part of the Texas map thus drawn, we looked to general historic locations of districts in the state, such as the districts in the Panhandle and the northeast corner of the state,

---

[10] We are not the first court to see the wisdom of this choice. *See, e.g., Johnson v. Miller*, 922 F. Supp. 1556, 1563 (S.D. Ga. 1995) (discussing the decision to place Georgia's additional congressional district in high population growth area near Atlanta), *aff'd sub nom., Abrams v. Johnson*, 521 U.S. 74 (1997).

[11] *See Bush v. Vera*, 517 U.S. 952, 1003 (1996) (Stevens, J., dissenting) ("Because Texas' growth was concentrated in south Texas and the cities of Dallas and Houston, the state legislature concluded that the new congressional districts should be carved out of existing districts in those areas.").

the north central districts of the Red River area,[12] through the metropolitan districts and the central plains. We then drew in the remaining districts throughout the state, emphasizing compactness, while observing the contiguity requirement.[13] We struggled to follow local political boundaries that historically have defined communities--county and city lines.[14] In the vernacular, "splits" of counties and cities in our drawing had to be a product of our neutral standards and the demands of population equality. We eschewed an effort to treat old lines as an independent locator, an effort that, in any event, would be frustrated by the population changes in the last decade. Nonetheless, the districts fell to their long-held areas, a natural result of the process we have described, much the same as the map drawn at our request by the State using Dr. Alford's neutral approach.

As we have explained, in our efforts to avoid splitting counties and cities, and in particular "double splits," or simultaneously moving populations in and out of a county between

---

[12] Cf. Johnson, 922 F. Supp. at 1565 (discussing Georgia's tradition of having four "corner districts" in its congressional plans).

[13] See Good v. Austin, 800 F. Supp. 557, 563 (E.D. Mich. & W.D. Mich. 1992) ("In addition to serving as a check on gerrymandering compactness 'facilitates political organization, electoral campaigning, and constituent representation.'" (quoting Karcher v. Daggett, 462 U.S. 725, 756 (1983) (Stevens, J., concurring))).

[14] See Karcher, 462 U.S. at 758 (Stevens, J., concurring) ("Subdivision boundaries tend to remain stable over time. Residents of political units such as townships, cities, and counties often develop a community of interest, particularly when the subdivision plays an important role in the provision of governmental services. In addition, legislative districts that do not cross subdivision boundaries are administratively convenient and less likely to confuse the voters." (footnote omitted)).

two districts, we also strove for compactness and contiguity. Doing so did much to end most of the below-the-surface "ripples" of the 1991 plan and the myriad of submissions before us. For example, the patently irrational shapes of Districts 5 and 6 under the 1991 plan, widely-cited as the most extreme but successful gerrymandering in the country, are no more.

As a check against the outcome of our neutral principles, we asked if the resulting plan was avoidably detrimental to Members of Congress of either party holding unique, major leadership posts. We looked at three Democrats and three Republicans, consensus members of this limited group, each with substantial leadership positions in the Congress. It was plain that these Members were not harmed in their reelection prospects by this plan and that, indeed, no incumbent was paired with another incumbent or significantly harmed by the plan. We thus considered no change in our map in response to this inquiry. Doubtlessly some may see any such weighting as an incumbency factor since congressional leadership so directly correlates with seniority. This view is not without force. Nonetheless, three circumstances must also be considered. First, this correlation is no longer so complete. Second, it does not here offer purchase to one political party over another. And, finally, it reflects a traditional state interest in the power of its congressional delegation distinct from partisan affiliation.

-8-

Finally, we checked our plan against the test of general partisan outcome, comparing the number of districts leaning in favor of each party based on prior election results against the percentage breakdown statewide of votes cast for each party in congressional races. This is a traditional last check upon the rationality of any congressional redistricting plan,[15] widely relied-upon by political scientists to test plans, if only in an approximating manner. We found that the plan is likely to produce a congressional delegation roughly proportional to the party voting breakdown across the state. It must be understood that any plan necessarily begins with a Democratic bias due to the preservation of protected majority-minority districts, all of which contain a high percentage of Democratic voters.

### III

Various parties urged us to create both African-American and Latino minority districts. These districts are not required by law, as discussed in more detail below, but could be created by the State so long as race was not a predominant reason for doing so. Whether to do so is, however, a quintessentially legislative decision, implicating important policy concerns.[16] We did not avoid creating such a district. At the same time, we did not depart from

---

[15] See, e.g., Good, 800 F. Supp. at 566-67 (using partisan fairness to assess plan drawn according to neutral principles).

[16] See Wyche v. Madison Parish Police Jury, 635 F.2d 1151, 1160 (5th Cir. Unit A Feb. 1981).

our neutral factors to draw any district not required by law. To do so would render our effort to keep our thumb off the political scale an illusion.[17]

IV

Finally, to state directly what is implicit in all that we have said: political gerrymandering, a purely partisan exercise, is inappropriate for a federal court drawing a congressional redistricting map.[18] Even at the hands of a legislative body, political gerrymandering is much a bloodfeud, in which revenge is exacted by the majority against its rival. We have left it to the political arena, as we must and wisely should. We do so because our role is limited and not because we see gerrymandering as other than what it is: an abuse of power that, at its core, evinces a fundamental distrust of voters, serving the self-interest of the political parties at the expense of the public good.

V

The parties presented competing plans for redistricting the Congressional seats. We have passed by the approach by which these plans were created in favor of the approach we have described, which we found to be mandated by our position as a federal court

---

[17] Cf. Abrams, 521 U.S. at 88.

[18] See Hunt v. Cromartie, 526 U.S. 541, 551 (1999); see generally Davis v. Bandemer, 478 U.S. 109, 117 n.6 (1986) (plurality opinion of White, J.); cf. Wyche v. Madison Parish Police Jury, 769 F.2d 265, 268 (5th Cir. 1985) ("Many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts.").

engaging in our "delicate task with limited legislative guidance."[19]

Several parties raise Voting Rights Act arguments in support of their preferred plans. In drawing our plan, we have endeavored to ensure that the plan complies with the goals of sections 2[20] and 5[21] of the Voting Rights Act.[22]

Our plan works no retrogression. We have maintained intact the existing districts, and, to the extent the boundaries have changed, as we "zeroed out" the plan, the minority populations have been either enhanced or not diminished in any meaningful way (*i.e.*, by mere fractions of percentages). Thus, although the minority populations in Districts 15, 16, and 30 represent a slightly smaller, but still overwhelming, percentage of the total populations of those districts as compared with the baseline 1991 plan as modified in 1996, we find that these changes do not result in "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."[23]

The Balderas plaintiffs argue that the congressional plan must contain seven Latino registration majority districts, within nine Latino voting age majority districts, to avoid a section 2

---

[19] *Abrams*, 521 U.S. at 101.

[20] 42 U.S.C. § 1973.

[21] 42 U.S.C. § 1973c.

[22] See *Abrams*, 521 U.S. at 90, 96.

[23] *Beer v. United States*, 425 U.S. 130, 141 (1976); see also *Abrams*, 521 U.S. at 95; *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478 (1997).

violation. The Martinez intervenors specifically argue for a Latino opportunity district in Dallas County to maintain compliance with section 2. Many parties, including the Texas Coalition of Black Democrats, argue for an African-American opportunity district, generally labeled District 25, in Fort Bend and Harris Counties.

The Latino and African-American plaintiffs thus present competing positions, reflecting a political reality that they are competitors in the political process.[24] This competition finds expression in an absence of cohesive voting between Latinos and African-Americans at the point in which it is meaningfully measured, the Democratic primaries.

We find that the plaintiffs have failed to prove that vote dilution will occur in violation of section 2 of the Voting Rights Act in the absence of seven Latino citizenship majority congressional districts or an African-American opportunity district, proposed District 25, in Fort Bend and Harris Counties. The evidence did not persuade us that either Latino or African-American voting age populations are sufficiently numerous to form voting age population majorities in effective districts.[25] The plaintiffs have also not proved that Latinos and African-Americans

---

[24] Several political scientists alluded to this political reality in their testimony.

[25] See *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852-53 (5th Cir. 1999).

vote cohesively as required by *Thornburg v. Gingles*[26] so as to constitute a majority in a single-member district.[27]

Looking first to the proposed African-American opportunity district, the Texas Coalition of Black Democrats has conceded that the evidence showed that African-Americans would not be an absolute majority of citizen voting age population in the proposed District 25. Again, the plaintiffs were unable to prove cohesive voting between Latinos and African-Americans sufficient to compel the drawing of a district in Fort Bend and Harris Counties.[28] The overwhelming evidence found to be persuasive was to the contrary.

The matter of creating such a permissive district is one for the legislature.[29] As we have explained, such an effort would require that we abandon our quest for neutrality in favor of a raw political choice. We offer no opinion as to the wisdom of an appropriate body doing so. Such arranging of voting presents a large and complex decision with profound social and political consequences. The Congress has by its enactment of voting rights laws constrained the political process and given the courts a role--to the extent of those constraints. We have no warrant to

---

[26] 478 U.S. 30, 50-51 (1986).

[27] See *Valdespino*, 168 F.3d at 852-53.

[28] See *Growe*, 507 U.S. at 41.

[29] See *Johnson*, 922 F. Supp. at 1567 ("Since political considerations pervade the redistricting task, the Court feels that any permanent footprint left on Georgia's political landscape ... should be left to those elected to make such decisions.").

impose our vision of "proper" restraints upon the political process beyond the constraints imposed by the Constitution or the Voting Rights Act. The Supreme Court put it succinctly in *Growe*, stating that, where there has been no showing establishing the "three *Gingles* prerequisites," then under section 2 of the Voting Rights Act "there neither has been a wrong nor can be a remedy."[30] A month later, the Court stated even more directly that, "[o]f course, the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law."[31]

In sum, these arguments so ably presented by Morris Overstreet, African-American attorney and former state official and candidate for elective office, and others are directed to the wrong forum, however much we may personally admire the arguments. It bears mention that our plan has hardly left a bleak terrain. In District 25 of our plan, the combined African-American and Latino voting age population increased to a 52.3 majority. In the practical world, this percentage will dominate the Democratic primary in a district that has consistently elected a Democratic congressman. This is, then, in a real sense, a minority district produced by our process that enhances the elective prospects of a minority, albeit not wholly the district sought.

As for the proposed Latino opportunity districts, the evidence

---

[30] 507 U.S. at 41.

[31] *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993).

shows that the Latino population is not sufficiently compact or numerous to support another, effective majority Latino citizenship district in Texas, in Dallas County or in South Texas.[32] We find that, under the totality of the circumstances, the failure to create seven such districts will not prevent full and equal Latino participation in the political process. It bears mention that our insistence upon compactness has increased the Latino force in District 24, a result supported by Congresswoman Eddie Bernice Johnson in her testimony at trial.

The Valdez-Cox plaintiffs also urge that Webb and Hidalgo Counties be left whole. We heard powerful arguments from the witness stand and counsel in opposition to a splitting of Hidalgo County in South Texas, and our neutral standards stood against such a county split. That standard was ultimately overriden as to Hidalgo County by the mandate of population equality under the principle of one-man, one-vote, and the existence of surrounding protected majority-minority districts. It is an ugly fact that the law's insistence on absolute population equality in court-drawn plans has the perverse effect of splitting counties and cities, when a tolerance of greater deviation would not demand such undesirable divisions. The split here of Hidalgo County is a fit

---

[32] See *Growe*, 507 U.S. at 39-40; *Gingles*, 478 U.S. at 50-51; *NAACP v. Fordice*, 252 F.3d 361, 365-67 (5th Cir. 2001).

example.[33]  Webb County was not caught in this squeeze and remains wholly intact in District 23.

## VI

There being no reason for delay, we direct entry of final judgment in this case pursuant to Federal Rule of Civil Procedure 54(b).

So **ordered** and **signed** this 14th day of November, 2001.

_____
PATRICK E. HIGGINBOTHAM
UNITED STATES CIRCUIT JUDGE

_____
JOHN HANNAH, JR.
UNITED STATES DISTRICT JUDGE

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

---

[33] We endeavored to and did respect the municipal boundaries of McAllen, a major population center of Hidalgo County.